CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 1 6 2020

JULIA C. DUDLEY, CLERK
BY: /s/ A. Beasley
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MARLON CANADY, | ) CASE NO. 7:17CV00464 |
| Plaintiff, | ) |
| v. | ) MEMORANDUM OPINION |
| M. HODGES, ET AL., | ) By: Glen E. Conrad |
| | ) Senior United States District Judge |
| Defendants. | ) |

Marlon Canady, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983. Canady alleges that prison officials used excessive force and acted with deliberate indifference to his serious medical needs, in violation of his constitutional rights. After review of the record, the court concludes that the defendants' motions for summary judgment must be granted in part and denied in part.

I. BACKGROUND.

In 2015, Canady was incarcerated at Keen Mountain Correctional Center ("KMCC"). On June 25, 2015, Inmate Ames attacked Canady with a heavy object in a sock.[1] Canady blocked the weapon with a trash can, fought Ames, and wrestled him to the floor. Floor officer Bostic sprayed Oleoresin Capsicum ("OC") pepper gas in the faces of both inmates.[2] The OC gas burning his eyes and blurring his vision caused Canady to climb off Ames and get on the floor. Nevertheless, without first giving a warning shot or horn, Officer Hodges in the control booth shot Canady in the back of his right thigh with a canister of OC gas. While Canady was already

---

[1] The summary of Canady's allegations, from his complaint and his declarations in support of his response to the defendants' summary judgment motions, ECF Nos. 1, 72-2, and 74-1, is stated here in the light most favorable to him as required at this stage of the litigation, and does not constitute any finding of fact.

[2] OC spray is a chemical agent similar to what is commonly known as pepper spray or mace and irritates a person's eyes, throat, and nose. See, e.g., Park v. Shiflett, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of OC spray).

on the floor, Bostic sprayed OC gas on Canady's face, eyes, chest, and arms a second time. Canady put his right arm up to protect his eyes from the spray, when he heard a dog bark, and Bostic backed away. Without any verbal warnings, Sergeant Barbetto then engaged his attack dog, Blitz, on Canady twice, shouting for the inmates to get to the floor, when Canady was already there. Canady suffered dog bites to his right forearm and his right hip. Bostic sprayed Canady with OC gas a third time, while he was lying face down.

Ames was found guilty of several prison disciplinary infractions as a result of his actions and was later transferred to a higher security facility. Canady was not charged with a disciplinary infraction for fighting, because surveillance camera footage proved that "he did not initiate the fight, and only acted to protect himself." Compl. 11, ECF No. 1.

After the incident, officers escorted Canady and Ames to segregation with another officer filming the process with a camcorder. They then placed Canady in a locked shower with his hands cuffed behind his back. Bostic delayed taking off the handcuffs for five to ten minutes and may also have delayed calling the medical unit for evaluation of Canady's injuries. After the officers removed his cuffs, Canady stood under the shower water for more than an hour.

When Acting Medical Administrator E. Whited reported to the shower area more than an hour after the incident, Canady told him that the OC gas was still burning his skin. Whited told him "there was nothing medical could be done for dog bites, and the [OC] gas would eventually wear off." Canady Decl. ¶ 19, ECF No. 72-2. Whited provided no medical treatment, no antibiotic ointment for infection, no medication for pain, no tetanus shot, and no solution to wash off the chemicals from the OC spray. He was only concerned with having Canady sign a $5.00 copay form for a future doctor's visit. Canady received a tetanus shot the next day.

2

Canady filed his § 1983 complaint in October 2017, suing Hodges, Bostic, Barbetto, and Whited. Canady alleges the following claims for relief: (1) on June 25, 2015, defendant Hodges used excessive force against Canady by firing an OC canister at him when Hodges knew the fighting had stopped; (2) Bostic used excessive force against Canady by spraying him with OC spray multiple times after the fighting had already stopped: (3) Barbetto used excessive force against Canady by engaging his canine two times after Canady was already lying on the floor as ordered; and (4) Whited acted with deliberate indifference to Canady's serious medical needs by providing no medical treatment on the day of the incident. As relief, Canady seeks monetary damages.

Defendants Bostic, Hodges, and Barbetto have filed a motion for summary judgment, supported with affidavits and other evidence, including surveillance camera footage, in support of their arguments that they used only the amount of force necessary to restore order.[3] Defendant Whited has filed a separate motion for summary judgment, supported by affidavits and medical records. Canady has responded to the motions, making them ripe for disposition.

## II. DISCUSSION.

### A. Exhaustion of Administrative Remedies

A prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies at the prison where he is confined. 42 U.S.C. § 1997e(a). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the facility provides to prisoners and meet all deadlines within that

---

[3] The court previously granted the defendants' motions to dismiss Canady's § 1983 claims as time-barred. Canady v. Hodges, No. 7:17CV00464, 2018 WL 3146792 (W.D. Va. June 27, 2018). Canady appealed. The court of appeals placed his appeal in abeyance, pending its decision in Battle v. Ledford, 912 F.3d 708, 718 (4th Cir. 2019) (applying federal equitable tolling principles to account for time lost during inmate's exhaustion of administrative remedies as mandated under 42 U.S.C. § 1997e(a)). Under the ruling in Battle, the parties filed a joint motion for summary reversal of the court's dismissal of Canady's claims as time-barred, the motion was granted, and the case was remanded for further proceedings.

3

procedure. See Woodford v. Ngo, 548 U.S. 81, 90-94 (2006). A defendant bears the burden of proving the affirmative defense that the plaintiff failed to exhaust available administrative remedies regarding his claims before filing suit. Jones v. Bock, 549 U.S. 199, 216 (2007).

Whited contends that before filing this lawsuit, Canady failed to exhaust administrative remedies regarding his claims against Whited. In support of this affirmative defense, however, Whited offers nothing more than the copies of grievances and appeals that Canady himself has submitted in support of his claims. Whited fails to present any affirmative evidence of the grievance procedures Canady was required to follow or showing that Canady did not file any other administrative remedies and appeals about his medical care. Accordingly, the court cannot grant Whited's motion for dismissal of Canady's claims against him under § 1997e(a).

B. The Summary Judgment Standard.

The standard for review on a motion for summary judgment is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery, and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. Id. at 255. To be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as

a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 233 (6th Cir. 1996).

When a motion for summary judgment is made and is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials of the pleadings. Anderson, 477 U.S. at 256 (citing Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. Id. at 256-57. Where the plaintiff's version of events is so utterly discredited by unchallenged video footage that no reasonable jury could believe him, summary judgment is appropriate. See Scott v. Harris, 550 U.S. 372, 380-381 (2007) ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); accord Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

C. The Excessive Force Claims.

The defendants offer the following evidence in support of their motion for summary judgment through affidavits and camera footage. On June 25, 2015, at approximately 8:51 a.m., Bostic saw Ames and Canady begin to fight. He radioed for assistance and instructed all inmates to lie on the ground. After an audible warning had issued in the pod, Hodges in the control booth fired a 40 mm single impact round of OC gas that struck Candy on the right thigh. At that point, Canady was on top of Ames, and they both continued to fight. Bostic approached them on foot and ordered them to stop fighting. When they failed to do so, Bostic administered a one half to one second burst of OC spray to the inmates' general facial areas. They continued to fight.

Bostic administered a second burst of OC spray toward the inmates' faces, but their struggles continued.

At this point, Barbetto arrived with his canine, Blitz, and gave three verbal warnings for Ames and Canady to stop fighting. They kept fighting. According to Barbetto, Canady attempted to kick Ames, and as he did so, Blitz engaged on Canady's right hip. Barbetto told Canady to stop resisting. Instead, Canady swung his left arm, and Blitz released Canady's hip and engaged his left arm. Video footage reflects that Blitz was engaged on Canady for only five to six seconds before Barbetto disengaged the dog. Barbetto states that in VDOC facilities, officers use canines when appropriate to help reduce assaults on staff and inmates by helping security officers to restrain disruptive inmates and otherwise control inmate behavior. He states that officers "do not allow K-9s to assault offenders." Mem. Supp. Mot. Summ. J. Barbetto Aff. ¶ 5, ECF No. 63-2.

After the altercation ended, officers restrained both inmates and escorted them to the special housing unit. At approximately 9:55 a.m., Whited reported to the unit and evaluated both inmates. According to the accident report, Whited noted no injuries from the dog bite to Canady's left arm and only a small laceration from the dog bite to his right thigh with a "scant amount of blood." Mitchell Aff. Encl. C, ECF No. 63-3.

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). It is well established that only "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992). On the other hand, not every malevolent touch by a prison guard amounts to a

deprivation of constitutional rights. Id. at 9. Where officers apply force in a good faith effort to restore order and discipline, there is no excessive force. Id. at 6-7.

In the excessive force context, the court must inquire whether officials, subjectively, applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" and whether "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." Id. at 6, 8 (emphasis added). The subjective inquiry considers: (1) the need for application of force, (2) "the relationship between that need and the amount of force used," (3) the extent of the injury, (4) "the threat reasonably perceived by the responsible officials" based on the facts known to them, and (5) "any efforts made to temper the severity of a forceful response." Id. at 7. To prove the objective component of his excessive force claim, Canady must show that the correctional officers' actions were more than a "de minimis use[ ] of physical force." Id. at 10. In short, in considering an excessive force claim, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 39 (2010).

Canady alleges that the defendants' uses of force against him all occurred when he and Ames had already stopped fighting, and he was on the floor as ordered. His allegations thus state a claim that the officers used more than trivial force to cause harm rather than to restore order. The defendants' testimony describes an ongoing fight that continued despite their good faith efforts to stop it, first with verbal orders, then using the OC munition round, then the bursts of OC gas, and finally, the canine, which convinced the inmates to separate and comply with orders. These contrasting versions of events would ordinarily present genuine issues of material fact as to the excessive force claims that would preclude summary judgment and require a trial.

7

In this case, however, the defendants argue that surveillance camera footage of the incident clearly shows that Canady and Ames continued to fight throughout the uses of force. Canady has viewed the video footage and does not challenge its accuracy. The court agrees that the video footage clearly depicts the inmates fighting when the impact round strikes Canady's leg and when Bostic applies the first burst of OC spray. The video thus soundly contradicts Canady's allegations that these uses of force were malicious because they were unnecessary to restore order, and the court cannot credit this portion of his account on summary judgment. Iko, 535 F.3d at 230. Accordingly, based on the video footage, the court concludes that no reasonable jury could find that either of these uses of force was excessive force in violation of the Eighth Amendment. Therefore, the court will grant summary judgment as to claim (1) against Hodges and claim (2) against Bostic as to his initial use of OC spray against Canady.

The court cannot agree that Canady's version of the officers' other uses of force is so inconsistent with the video footage that no reasonable jury could believe him. After the first burst of OC spray, the cameras' views of the fighting inmates are soon partially obscured by a bench or officers' bodies. The video is also shot from a distance, making it difficult to distinguish when Bostic applies the second burst of OC spray or what the inmates are doing when the dog bites Canady. Finding genuine issues of material fact in dispute between the parties' accounts, the court will deny the defendants' motion for summary judgment as to the remainder of claim (2) and claim (3).

### D. The Medical Claims.

Whited, relying on the attached medical records, offers this account of events in his affidavit. On June 25, 2015, Whited responded to a request for medical assistance and arrived to find Canady in the shower area. According to Whited's medical notes, Canady reported that he

8

had been shot in the back of the head and bitten by a dog on his left arm and right thigh. Whited also noted that Canady was complaining about the continued effects of the exposure to the OC round and spray. Whited examined Canady and found no sign of injury to his head or his left arm.

Whited observed three areas of broken skin on Canady's right thigh—a one-inch laceration showing a small amount of blood and two smaller ones that showed no active bleeding. He also saw a small amount of blood on Canady's boxer shorts, but did not find any other injuries on the inmate. Whited encouraged Canady to continue rinsing off the OC residue in the shower. He also gave Canady triple antibiotic ointment to apply to his right thigh, and the inmate received a tetanus shot that same day.

On June 30, 2015, another provider examined Canady and documented that the dog bite area was "healing well." Mem. Supp. Summ. J. Ex. A, Whited Aff. ¶ 11, ECF No. 58-1. The institutional physician examined Canady on July 2, 2015, and observed that the dog bite wound was "scabbed up." Id. at ¶ 12. The doctor found no need for additional treatment.

An inmate's Eighth Amendment protections against cruel and unusual punishment include a right to the medical care necessary to address his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). Specifically, a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

The first part of this legal standard is objective. It requires showing that the inmate's medical condition is "serious—one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. The second, deliberate indifference part of the standard is

subjective. The plaintiff must show that the defendant knew of and disregarded an excessive risk to inmate safety or health. Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Whited argues that the injuries he observed on Canady's body on June 25, 2015, were not sufficiently serious to trigger a constitutional claim. He relies on his own description of the size of the dog bites and the amount of blood he saw. Whited also asserts that he did not disregard the risk of harm these injuries posed, because he provided antibiotic ointment and the tetanus shot, and encouraged continued showering.

In response to Whited's evidence, Canady presents his declaration. He denies reporting that the OC canister struck him in the head or that the dog bit his left arm, because the canister struck him in the back of his right thigh and the dog bit him on his right forearm and his right hip. Canady denies receiving any antibiotic ointment from Whited. He also complains that Whited did not offer pain medication for the dog bites, which he claims were "much larger than" the wounds Whited's notes described. Decl. ¶ 19, ECF No. 72-2.

On the current record, the court finds that Canady has presented genuine issues of material fact in dispute on which a rational fact finder could be persuaded that Whited acted with deliberate indifference to Canady's serious medical needs on June 25, 2015. Jackson, 775 F.3d at 178. Accordingly, the court will deny Whited's motion for summary judgment.

III. CONCLUSION.

For the stated reasons, the court concludes that the motion for summary judgment filed by defendants Barbetto, Bostic, and Hodges must be granted as to claim (1) against Hodges and claim (2) against Bostic, regarding his initial use of OC spray against Canady. The motion must be denied, however, as to the other excessive force claims against Bostic and Barbetto. The

court also concludes that the motion for summary judgment filed by defendant Whited must be denied. The court will direct the clerk to schedule the remaining claims for trial.

An appropriate order will enter this day.

ENTER: This 16th day of March, 2020.

*/s/ Glen Conrad*
Senior United States District Judge